**Maurice A. BISSONNETTE**

v.

**HANTON CITY REALTY CORPORATION.**

No. 85–240–Appeal.

Supreme Court of Rhode Island.

July 17, 1987.

Donald J. Packer, Hogan & Hogan, East Providence, for plaintiff.

John Quattrocchi, Jr., Providence, for defendant.

## OPINION

FAY, Chief Justice.

In the matter before us, a Superior Court justice, sitting without a jury, awarded a judgment of specific performance of a contract for the sale of land to the plaintiff-buyer and ordered him to reimburse the defendant-seller for the real-estate taxes paid on the property since the date that had originally been set for closing. The defendant appeals from the judgment as well as from the refusal of the trial justice to award it interest on the unpaid purchase price. The plaintiff cross-appeals from the order directing him to pay taxes on the property.

The following facts are not in dispute. The property in question is located in Smithfield, Rhode Island, and consists of lots numbered 79 and 91 on tax assessor's plat No. 49. On April 9, 1977, it was owned by defendant, Hanton City Realty Corporation (Hanton City), the president, secretary, treasurer, and sole shareholder of which was Frank DiCenzo (DiCenzo). We shall refer to Hanton City and DiCenzo interchangeably.[1]

In 1977 plaintiff Maurice Bissonnette (Bissonnette) owned several parcels of land either near or abutting the tract in question and was interested in accumulating more. He expressed this interest to Beverly Dobson (Dobson), a licensed real-estate broker

---

1. It was determined at trial that DiCenzo had the authority to act for Hanton City. The defendant does not appeal from that finding.

who had handled other real-estate deals in which he was involved in the area.

Sometime between March and April Dobson received information through Frank Mannarelli (Mannarelli), the owner of Hilldale Estates, a development in Smithfield, and DiCenzo's nephew by marriage, that DiCenzo's land was for sale. Dobson had known Mannarelli for several years, having previously sold houses and lots in Hilldale Estates for him; she was not aware of his relationship to DiCenzo.

On April 9, 1977, in Dobson's office, Bissonnette gave Dobson a check for $5,000 as a deposit on the purchase of DiCenzo's land and filled out a combination receipt and purchase-and-sale agreement on a pad of such forms interspaced with carbon paper. The document acknowledged the receipt of the $5,000 deposit, identified the property, and specified a purchase price of $125,000 subject to five terms and conditions, two of which were the delivery of a good and sufficient warranty deed within ninety days and the payment of a $7,000 finder's fee to Dobson. Dobson signed the agreement on behalf of the realty company and Bissonnette on the line marked "Buyer." Dobson put the check in escrow and delivered the agreement to Mannarelli, who then took it to DiCenzo. DiCenzo signed it on the line marked "Seller," underneath a printed line that read, "(We) the undersigned seller(s) hereby agree to sell above mentioned property, at price and terms above stipulated; at election of agency deposit may be held in escrow by agency or by seller."

This initial agreement referred only to lot No. 79. When the title search revealed that the adjoining lot, No. 91, was part of the same tract of land, Dobson added a sixth term to this effect to the carbon copy of the original document and sent it again through Mannarelli to DiCenzo for confirmation; it was returned with DiCenzo's full signature at the bottom and his initials at the end of the added sixth term.

On July 7, 1977, Dobson added a line to the top of the original agreement, extending the date for closing to July 30. She again gave the document to Mannarelli, who returned it to her with DiCenzo's full signature beneath the added line.

There was apparently an attempt to close the deal at the office of Bissonnette's attorney in the early fall; DiCenzo did not appear. In mid-October of 1977, Bissonnette's attorney wrote to DiCenzo's attorney pressing for a closing date on the property and received a response stating "I am doing my best to push * * * Mr. DiCenzo." Dobson returned Bissonnette's $5,000 deposit sometime after the aborted closing, and Bissonnette deposited it in his checking account on December 19, 1977. In February of 1978 Bissonnette brought this action for specific performance. The matter was heard in December of 1984, and specific performance was ordered in January of 1985.

On appeal, the defendant raises several claims of error, only three of which we find to merit any discussion. Additional facts will be presented as necessary.

■ DiCenzo first contends that Bissonnette abandoned the contract by accepting the refund of his deposit and that the trial justice erred in not ruling accordingly. It is well established that "[w]hether a party has abandoned a contract depends upon the concurrence of two factors: an intent to abandon, together with some act or omission which warrants the conclusion that the abandoning party no longer claims or retains any interest in the subject matter." *Adams-Riker, Inc. v. Nightingale*, 119 R.I. 862, 865, 383 A.2d 1042, 1044 (1978); *Jakober v. E. M. Leow's Capitol Theatre, Inc.*, 107 R.I. 104, 110, 265 A.2d 429, 433 (1970). The determination of whether there has been an abandonment is a question of fact. *Jakober*, 107 R.I. at 111, 265 A.2d at 433. The findings of fact of a trial justice sitting without a jury are accorded great deference and will not be disturbed unless it is demonstrated that he or she misconceived or overlooked material evidence or was otherwise clearly wrong. *Miller v. Dixon Industries Corp.*, 513 A.2d 597, 601 (R.I. 1986).

■ Dobson testified that she returned the deposit to Bissonnette when she went out of business and closed out her escrow

account and that at that time Bissonnette declared his intention to follow through with the deal. Bissonnette testified that even after he accepted the refund, it was never his intention to forget the transaction; the letter sent by his attorney to DiCenzo's attorney in mid-October is further testimony to his desire to pursue the matter. That he was financially ready, willing, and able to go through with the deal is clear from testimony detailing his extensive unmortgaged real-estate holdings. Bissonnette had also arranged for the title to be searched and verified, and at the time of closing and thereafter, these papers were in order.

DiCenzo testified that he communicated his intention not to go through with the deal to Dobson on the telephone in the early fall, intimating that Bissonnette's acceptance of the return of the deposit was an acknowledgment of the failure of the deal, but Dobson denied having spoken to DiCenzo. She did admit having been told by Mannarelli that DiCenzo was not going through with the sale. However, the response letter to Bissonnette's attorney from DiCenzo's attorney makes no mention of the possibility that DiCenzo had decided not to sell the property but only indicates difficulty in arranging a closing.

On the basis of this evidence, it cannot be said that the trial justice was clearly wrong in determining that abandonment had not taken place. Accordingly, DiCenzo's contention has no merit.

DiCenzo maintains that he did not appear at the closing because a condition precedent to the agreement had not been met—namely, that he receive a $10,000 deposit—and that the contract is therefore void and unenforceable. He contends that the trial justice erred in refusing to allow parole evidence concerning this condition precedent to alter the agreement.

DiCenzo testified that both before he signed the initial agreement and again before he signed the extension provision, he told Mannarelli, whom he thought was involved in the deal, that he wanted to receive a $10,000 deposit on the property. He contends that his communication of this information to Mannarelli, allegedly Bissonnette's agent, was tantamount to communicating it to Bissonnette.

There is clearly no evidence in the record to suggest that an agency relationship existed between Mannarelli and Bissonnette—no evidence that they had agreed that Bissonnette would have control over Mannarelli's actions. See Lawrence v. Anheuser-Busch, Inc., 523 A.2d 864, 867 (R.I. 1987). Mannarelli testified that he never met Bissonnette and that he would receive no commission upon the sale of the property; Dobson testified that Mannarelli would receive no part of her finder's fee. Furthermore, at trial Mannarelli could not recall whether DiCenzo mentioned a $10,000 deposit before he signed the first agreement; he recalled discussing a deposit only at the time DiCenzo signed the extension provision, when he told DiCenzo that one was being held by the real-estate agent.

Dobson and Bissonnette both testified that they had no knowledge of the alleged condition precedent. The agreement signed by DiCenzo clearly and unambiguously acknowledges the receipt of a $5,000 deposit and states that "at the election of the agency" it would be held either by the agency or the seller. Although DiCenzo testified that he did not read the documents when he signed them, no evidence exists in the record to indicate that he was deceived or misled regarding their contents.

The parole-evidence rule permits the introduction of extrinsic evidence to change, vary, or alter the written terms of an agreement when it is offered to show a condition precedent to the existence of the contract. Lisi v. Marra, 424 A.2d 1052, 1055 (R.I.1981). Our review of the record indicates that the trial justice considered the evidence regarding the alleged condition precedent in this case and correctly determined that it had not been agreed to by the parties. It could therefore not be considered to have altered the written agreement, which was clear and unambiguous in its terms.

After awarding specific performance of the contract to Bissonnette, the trial justice

denied DiCenzo's claim for interest on the purchase price from the time originally set for closing until the time of judgment, citing *Bright v. James*, 35 R.I. 492, 87 A. 316 (1913) and *Sweeney v. Brow*, 40 R.I. 281, 100 A. 593 (1917) for support. He further ordered Bissonnette to reimburse DiCenzo for the taxes paid during that time. DiCenzo contends that he is entitled to interest since his violation of the contract was not willful or malicious. On cross-appeal Bissonnette maintains that since there was no award of rents or profits, he should not be held responsible for the taxes.[2]

█ It is generally agreed that the compensation awarded as incident to a decree for specific performance is "more like an accounting between the parties than like an assessment of damages." Annot. 7 A.L.R.2d 1204, 1206 (1949). If the court orders that a contract be performed, "the decree must as nearly as possible order it to be performed according to its terms, and one of those terms is the date fixed by it for its completion. This date having passed, the court, in order to relate the performance back to it, equalizes any losses occasioned by the delay by offsetting them with money payments." *Id.*

█ For the purposes of such an accounting, as we have noted, purchasers " 'are treated as having owned the land from the date of the tender. But, as they are only entitled to the land on payment, it follows that they must account for the money from the same date.' " *Sweeney v. Brow*, 40 R.I. at 292, 100 A. at 596; *see generally* Annot. 7 A.L.R.2d at 1206–07. Accordingly, the purchaser is ordinarily allowed the rents and profits of the land, or its rental value, and the vendor, interest on the purchase money from the time fixed by the contract to the day when conveyance is made. *Williston on Contracts* § 1430 at 876–77 (Jaeger, 3d ed. 1968). When, however, the delay in the performance is the vendor's fault and interest exceeds rents and profits, the vendor will be allowed to retain rents and profits but allowed no interest. *Id.* at 877. If in such circumstances a purchaser elects to claim the rental value or rents and profits, the vendor is entitled to set off against such amount the interest on the unpaid purchase money but not to receive any excess thereof. Annot. 7 A.L.R.2d at 1212.

The cases cited by the trial justice comport with this authority. In *Bright v. James* we denied a vendor in default interest on the unpaid purchase price, holding that a vendor ought not to be permitted to charge a purchaser with interest upon money that the vendor refused to receive. 35 R.I. at 495, 87 A. at 317. In *Bright* the purchaser was not awarded rents or profits because he was found to be partially at fault for the delay. *Id.* at 494–95, 87 A. at 317.

In *Sweeney*, we affirmed the validity of the rule in *Bright* but held that where the purchaser had asked for and been awarded compensation for the rental value of the property from the date of the refused tender until the date of the decree of specific performance, the vendor was entitled to the interest on the unpaid balance on the purchase price. 40 R.I. at 292–95, 100 A. at 595–97. In *Sweeney* the rental value exceeded the amount of interest due, *id.* at 284, 100 A. at 593, so we did not specifically address the question of excess of interest over rents and profits. It is, however, a logical extension of our ruling in *Bright* that a vendor in default would not be entitled to the excess of interest over profits should an award of profits be made.

In accordance with the above rules, the trial justice made no award of rents or profits and denied DiCenzo interest on the purchase price. DiCenzo contends that he was not a willful or malicious contract violator but rather an innocent victim of circumstances and that to penalize him for his nonperformance of the contract by denying him interest is inequitably punitive. He alludes to recent cases in other jurisdic-

---

**2.** DiCenzo first testified as an adverse witness that he had removed 10,000 cubic yards of sand and gravel from the property during the period in question and valued it at $2 a yard. Later, on direct examination, he testified that he removed only fill, worth 35 to 50 cents a yard. He also testified that trees had been cut and removed from the property.

---

tions that make this distinction in determining whether to award the vendor interest in excess of rents and profits. *See Eliason v. Watts,* 615 P.2d 427, 431 (Utah 1980).

It is clear from the evidence that DiCenzo was not a novice in business, having been involved in construction work for several years. He therefore had to have been aware of the effect of signing an agreement, and the evidence is that he signed, not once, but three times, a contract clearly calling for a deposit of $5,000. Furthermore, his testimony with regard to the alleged requirement of a $10,000 deposit is uncorroborated. Thus it is not clear that DiCenzo was an "innocent victim of circumstances" and that his delay in performing the contract was not willful. We see no reason to alter our long-standing compliance with the above rules in fact circumstances such as these.

With regard to the question of taxes, a vendor is required to account for net profits only, being entitled to credit for necessary disbursements that ordinarily would have been chargeable to the purchaser had the title been conveyed at the proper time. *DiSarro v. Neri,* 74 R.I. 118, 123–24, 59 A.2d 174, 176 (1948). Having been absolved from paying any interest on the unpaid purchase price, Bissonnette has, in effect, been awarded rents and profits, despite his contentions to the contrary. DiCenzo is accordingly entitled to be reimbursed for the taxes paid. To hold otherwise would clearly be inequitable. *See D–K Investment Corp. v. Sutter,* 19 Cal. App.3d 537, 550, 96 Cal.Rptr. 830, 837–38 (1971).

For the reasons stated, the defendant's appeal and the plaintiff's cross-appeal are denied and dismissed, the judgment of the Superior Court is affirmed, and the papers in the case are remanded to the Superior Court.

KELLEHER and SHEA, JJ., did not participate.