Greensleeves, Inc.                    :

v.                    :

Philip B. Smiley, Sr. et al.                    :

NOTICE:    This opinion is subject to formal revision before publication in the Rhode Island Reporter.  Readers are requested to notify the Opinion Analyst, Supreme Court of Rhode Island, 250 Benefit Street, Providence, Rhode Island 02903, at Telephone 222-3258 of any typographical or other formal errors in order that corrections may be made before the opinion is published.

Greensleeves, Inc.        :

v.        :

Philip B. Smiley, Sr. et al.        :

Present: Suttell, C.J., Goldberg, Flaherty, Robinson, and Indeglia, JJ.

**O P I N I O N**

**Justice Indeglia, for the Court.** The defendant, Eugene Friedrich, appeals from a Superior Court judgment awarding damages in the amount of $61,258.05 plus prejudgment interest in the amount of $90,532.39 and costs to the plaintiff, Greensleeves, Inc. (Greensleeves or Meyer). On appeal, Friedrich contends that the trial justice erred in (1) finding that he had tortiously interfered with Greensleeves's contract; and (2) denying his motion to amend the judgment to reduce the award of prejudgment interest. After reviewing the record and considering the parties' written submissions and oral arguments, we find no reversible error on the part of the trial justice and affirm the judgment of the Superior Court.

**I**

**Facts and Travel**

We have become abundantly familiar with the facts and tortured procedural history of this case. The uninitiated reader is directed to this Court's prior decision in Greensleeves, Inc. v. Smiley, 942 A.2d 284 (R.I. 2007) (Greensleeves II). With that in mind, we briefly discuss the facts pertinent to this appeal.

- 1 -

Elizabeth Meyer is the sole shareholder and chief executive officer of Greensleeves.[1]  In 1993, Meyer purchased land and acquired condominium dock slips at Lee's Wharf Marina in Newport (Lee's Wharf).   In 1995, Philip B. Smiley, Sr. contacted his real estate broker, Joseph W. Acetta, in an effort to sell six of his dock slips at Lee's Wharf.  Aware that Meyer had previously bid on these dock slips at a prior auction, Acetta then contacted her regarding a potential sale.[2]  Their negotiations proved successful.  On May 24, 1995, Acetta sent a letter to Meyer's attorney outlining the negotiated agreement whereby Smiley agreed to sell the dock slips to Greensleeves for $165,000, which was to be paid on the date of the closing.  Thereafter, Greensleeves and Smiley orally agreed to treat that letter as the purchase and sale agreement, rather than draft a formal agreement.  The closing was set for June 14, 1995.

On the heels of that agreement, on June 9, 1995, Smiley entered into a purchase and sale agreement with Friedrich for the sale of those same dock slips (Smiley-Friedrich contract).  They negotiated a sale price of $175,000—$10,000 more than Smiley had negotiated with Meyer— which included a $20,000 down payment in cash.  The closing was set for June 15, 1995. Suffice it to say, Smiley refused to convey the dock slips to Greensleeves, in direct contravention of their earlier agreement.

Greensleeves then immediately filed suit against Smiley in the Newport County Superior Court, seeking specific performance of its agreement with Smiley.  Additionally, Greensleeves filed a notice of lis pendens on the dock slips in the land evidence records of the City of Newport.  Friedrich then intervened, pursuant to Rule 24 of the Superior Court Rules of Civil Procedure, and moved to dismiss the complaint.  The hearing justice found that Acetta's May 24, 1995 letter to Meyer's attorney did not satisfy the statute of frauds and declared that there was no

---

[1] We refer to Meyer and Greensleeves interchangeably throughout this opinion.
[2] The record reveals that Friedrich had also bid on these dock slips on three separate occasions.

enforceable contract between Greensleeves and Smiley.  On August 11, 1995, he granted judgment in favor of Smiley and Friedrich and granted Smiley's motion to strike the lis pendens notice.  Later that day, Smiley conveyed the dock slips to Friedrich, pursuant to their contract.

Greensleeves then timely appealed to this Court.  We vacated the judgment of the Superior Court, holding that there was an enforceable contract between Greensleeves and Smiley because the May 24, 1995, letter "contained all the elements necessary to constitute a contract" for the sale of the dock slips.  Greensleeves, Inc. v. Smiley, 694 A.2d 714, 716 (R.I. 1997) (Greensleeves I).  Accordingly, we remanded the case to the Superior Court.  Id. at 717.

On remand, Greensleeves moved for summary judgment and sought specific performance of its agreement with Smiley.  The hearing justice granted specific performance in favor of Greensleeves, on February 6, 1998.  Friedrich appealed to this Court, and in an unpublished order dated January 15, 1999, we affirmed the hearing justice's ruling.  Thereafter, Friedrich relinquished his ownership of the dock slips, which were then appropriately conveyed to Greensleeves.  In the meantime, Greensleeves sought an accounting of the rental income that had been collected from the dock slips from June 14, 1995 (the date of the originally-scheduled closing between Greensleeves and Smiley) through the 1999 boating season.

A hearing was held on April 14, 2000, and the parties stipulated that the amount of rental income totaled $61,258.05.  They also stipulated as to the amount of interest that Greensleeves had earned on the $165,000 it had retained due to the fact that its June 14, 1995 closing with Smiley never took place.  The hearing justice then issued an order on May 16, 2000, ruling that, under the accounting principle prescribed in Bissonnette v. Hanton City Realty Corp., 529 A.2d 139 (R.I. 1987), "[t]he rent and profits earned by * * * Eugene Friedrich [were] to be offset by

- 3 -

interest on the purchase money."[3]  Thus, the hearing justice ruled that Greensleeves was not entitled to the lost rental profits.

Again, Greensleeves appealed to this Court.[4]  On appeal, we examined the hearing justice's application of the <u>Bissonnette</u> rule.  We agreed that the <u>Bissonnette</u> rule barred Greensleeves from collecting the lost rental profits as part of the specific performance remedy, and we noted that the compensation contemplated under the <u>Bissonnette</u> rule is "more like an accounting between the parties than an assessment of damages."  <u>Greensleeves II</u>, 942 A.2d at 293 (quoting <u>Bissonnette</u>, 529 A.2d at 143).  However, we reversed the ruling concerning the remedy available for Greensleeves's tortious interference of contract claim.  <u>Id.</u>  We held that the <u>Bissonnette</u> rule did not bar Greensleeves from collecting the lost rental profits under a claim of tortious interference of contract.  <u>Id.</u> at 294.  We stated that the case "may be remanded to the Superior Court" in order to determine whether Friedrich tortiously interfered with the Greensleeves-Smiley contract.  <u>Id.</u>

On remand, a two-day bench trial commenced.  It is the Superior Court's decision on that remand that is now before this Court.  The following (at times conflicting) facts were adduced.

---

[3] In <u>Bissonnette v. Hanton City Realty Corp.</u>, 529 A.2d 139 (R.I. 1987), we ruled that the remedy of specific performance of contract puts the buyer and seller in the position they would have been had they consummated the real estate closing on the date set forth in the contract.  <u>Id.</u> at 143.  Thus, the buyer is entitled to the rents and profits earned between that date and the date of the specific performance, and the seller is entitled to the interest earned on the purchase money during the same period.  <u>Id.</u>

[4] On February 8, 2002, in an unpublished order, this Court initially dismissed the appeal because final judgment had not entered with respect to all of the outstanding claims.  We thus remanded the case to the Superior Court.  Greensleeves then dismissed its remaining claims against Smiley. Smiley and Friedrich also dismissed their cross-claims against each other.  Additionally, Greensleeves waived all other claims for damages against Friedrich.  Thus, only Greensleeves's tortious interference of contract claim against Friedrich remained viable.  On remand, applying the law of the case doctrine, another justice ruled that Greensleeves was barred from recovering the lost rental profits as damages under its tortious interference of contract claim.

Friedrich became a member of Lee's Wharf in 1990, became a member of the board of directors in 1991, and served as president of the marina association from 1994 until 2005. In 1993, Meyer acquired land and dock slips at Lee's Wharf.

In support of the claim that Friedrich tortiously interfered with the Greensleeves-Smiley contract, Meyer testified that she and Friedrich had an acrimonious relationship at the marina and that Friedrich was persistent in his efforts to "thwart whatever [she] was doing * * * in the marina association context." Further, she described her relationship with Friedrich as a "bewildering series of very negative and aggressive * * * attack[s]" by him against her. She further testified that, shortly after she first acquired dock slips at the marina, Friedrich prohibited the tenants using her dock slips from parking in the marina's lot. Meyer attempted to raise this issue at the marina's annual meeting; however, after Friedrich outright refused to put it on the agenda, she filed a lawsuit to enforce her parking lot rights. Lee's Wharf then countersued, and Friedrich accused her of deliberately colluding to defraud the association of its right to park in another lot she owned on adjacent property. She ultimately prevailed on her claim, and the association's counterclaim was denied.

Thereafter, according to Meyer, in 1994, the marina withheld the rental income due to her on the rentals of her dock slips. She protested to Friedrich, again to no avail. Nonetheless, despite not receiving her rental income, she testified that she continued to pay her dock slip fees. She then filed suit against the marina demanding payment of that rental income, and she again ultimately prevailed.[5]

In response to Meyer's testimony, Friedrich maintained that he did not have any "personal animosity" toward Meyer. However, he also testified that "there was always friction

---

[5] The trial justice took judicial notice of both of the above-referenced lawsuits; both decisions were marked as full exhibits.

between Miss Meyer and the board," and that he and the board harbored a belief that she was "trying to indirectly control the board." He stated that, in the above-referenced interactions with Meyer, he acted in a representational capacity at the direction of the board, and not out of any personal dislike for Meyer. Indeed, at trial, Meyer likewise acknowledged that the complained-of interactions with Friedrich related to the marina association.

Turning to the facts surrounding the sale of the dock slips, Meyer testified that she and Smiley entered into negotiations regarding their sale in 1995. On May 24, 1995, they summarized the negotiated terms in a letter, which this Court later deemed to be a valid and enforceable contract. See Greensleeves I, 694 A.2d at 716. Meyer further testified that, shortly thereafter, she had a conversation with William Bullard, the assistant dockmaster at Lee's Wharf, in which she told him that she was buying Smiley's dock slips. Subsequently, when Smiley refused to consummate the closing on the dock slips in breach of their agreement, she again spoke with Bullard. She recalled that Bullard then told her: "[W]hen I told [Friedrich] that you were buying Smiley's slips he ran down the dock * * *—first he said over my dead body, then he ran like a bat out of hell down the dock." She testified that, Friedrich "had grabbed the slips out from under [her]."

Although Bullard did not testify at trial, his deposition was admitted into evidence as a full exhibit. Contrary to Meyer's testimony, Bullard's deposition did not reveal that Meyer had informed him about her agreement to purchase Smiley's dock slips. Instead, Bullard stated that it was Smiley who told him that he was selling his dock slips to Meyer. Bullard testified that, after learning this, he informed Friedrich that Smiley had sold his dock slips to Meyer.[6]

---

[6] Bullard could not specifically recall how much time had lapsed between his conversation with Smiley and his later conversation with Friedrich, although he testified that "[i]t couldn't have been long."

According to Bullard, Friedrich "was astonished" to learn about the sale to Meyer, and at that point Friedrich "turned around and went back to his car and took off."

Contrary to Bullard's deposition testimony, on direct examination by Meyer's counsel, Friedrich testified that Bullard had never informed him that Smiley was selling the dock slips. However, Friedrich was then impeached with his prior inconsistent deposition testimony. When asked at his deposition "what date" Bullard told him about the sale of the dock slips, Friedrich responded that it was June 7 or 8, 1995. Later at trial, on direct examination by his own counsel, he again contradicted his prior testimony. He testified that Bullard told him that Smiley was actively marketing the dock slips, but that Bullard would not tell him whom Smiley was dealing with or the negotiated price he had obtained. He further testified that, after that conversation with Bullard, he called Smiley and "chewed him out" for not letting him know that he was marketing the dock slips. He acknowledged that he had a longstanding interest in those dock slips and that he had previously had numerous communications with Smiley, in which he informed Smiley that he was "interested in buying" those dock slips. He testified that, well before the Greensleeves-Smiley contract, he thought the dock slips "looked like a good investment" and had (unsuccessfully) bid on them at three prior auctions.

According to Friedrich, in his phone conversation with Smiley, Smiley did not disclose whom he had been dealing with regarding the potential sale of the dock slips—only that he had a meeting scheduled for that night. Friedrich testified that, when he spoke again with Smiley the following day, Smiley informed him that "he had no deal with the other party." Later that same day, he and Smiley signed an agreement for the sale of the dock slips, whereby he agreed to pay $175,000 for the dock slips, including a $20,000 cash deposit. He testified that he paid the $20,000 cash deposit to Smiley on June 11, 1995.

However, Friedrich was again impeached with a prior inconsistent statement he had offered in his deposition. Although Friedrich testified at trial that he did not know that Smiley was dealing with Meyer regarding the sale of the dock slips, his deposition testimony revealed that "[a]t some point * * * between the time that [he and Smiley] were drafting the purchase and sale agreement and [the time] [Smiley] came for the $20,000 deposit," Smiley had told him that he had been dealing with Meyer regarding their sale.

Smiley was also called as a witness at trial. Contrary to Friedrich's deposition testimony, Smiley testified that he did not inform Friedrich about his agreement to sell the dock slips to Meyer. However, Smiley was also impeached with his prior deposition testimony. At his deposition, he had testified that, on the day he and Friedrich executed their agreement for the sale of the dock slips, Friedrich knew that Meyer "was the person [Smiley] had been dealing with regarding the sale of [those] slips." Additionally, in a pleading filed in the Superior Court in this case,[7] Smiley brought a cross-claim against Friedrich, alleging that Friedrich was "aware of Smiley's negotiations with Greensleeves" and that Friedrich had "interfered with the relationship between Smiley and Greensleeves without legal justification to do so."

At the conclusion of the bench trial, the trial justice found in Greensleeves's favor on its tortious interference of contract claim. In a bench decision on February 25, 2010, the trial justice recited the elements of that claim, as identified in Belliveau Building Corp. v. O'Coin, 763 A.2d 622 (R.I. 2000): "(1) [T]he existence of a contract; (2) the alleged wrongdoer's knowledge of the contract; (3) his [or her] intentional interference; and (4) damages resulting therefrom." Id. at 627 (quoting Smith Development Corp. v. Bilow Enterprises, Inc., 112 R.I. 203, 211, 308 A.2d 477, 482 (1973)).

---

[7] As noted above, Greensleeves had also named Smiley as a defendant in this case.

The first element was satisfied, the trial justice noted, since this Court had already found that a valid contract existed between Greensleeves and Smiley for the sale of the dock slips. See Greensleeves I, 694 A.2d at 716. As to the second element, he found that "Friedrich was aware of Greensleeves's contractual relations with Smiley to buy the [dock slips] on June 8, 1995." Regarding the third element, he determined that Friedrich had "convinced * * * Smiley to break any contractual relationship with Greensleeves." Additionally, he found that Friedrich intentionally "undercut" the agreement already reached between Greensleeves and Smiley for the sale of the dock slips "because of his resentment of Meyer[,] * * * [whom] he saw * * * as a threat to his control of the association * * * at [the] [m]arina."

Further, the trial justice stated that to prevail on a claim of tortious interference of contract, the interference must also be shown to be "improper." He listed seven nonexclusive factors to consider in making that determination: "(1) [T]he nature of the actor's conduct, (2) the actor's motive, (3) the contractual interest with which the conduct interferes, (4) the interest sought to be advanced by the actor, (5) the balance of the social interest in protecting freedom of action of the actor and the contractual freedom of the * * * plaintiff, (6) the proximity of the actor's conduct and the interference complained of, and (7) the parties' relationship."[8]

In examining those factors, the trial justice found that the parties had an acrimonious relationship. He categorized Friedrich's conduct as "covert and aggressive" in undermining Meyer's ability to buy the dock slips, and classified Friedrich's "personal animus" toward Meyer as his motive in doing so. He found that Friedrich opposed Greensleeves's acquisition of the dock slips in order to thwart any increase in its voting interest in the association. Additionally, he found that the balancing of the social interest weighed in favor of Greensleeves because

---

[8] In Belliveau Building Corp. v. O'Coin, 763 A.2d 622, 628 n.3 (R.I. 2000), we recited the above-referenced factors, citing the Restatement (Second) Torts § 767 at 26-27 (1979).

Friedrich interfered with the Greensleeves-Smiley contract immediately after he found out about the agreement, offering Smiley more money for the dock slips and $20,000 in cash. Considering all of the factors together, the trial justice ultimately concluded that Friedrich had tortiously interfered with the contract between Smiley and Greensleeves, and that Greensleeves was entitled to the lost rental profits of $61,258.05, plus interest and costs. Judgment entered on March 29, 2010. Friedrich then timely appealed to this Court.

During the pendency of the appeal, Friedrich moved to amend the judgment under Rule 59(e) of the Superior Court Rules of Civil Procedure. He contended that, because Greensleeves had filed two unsuccessful appeals during the travel of the case,[9] which unnecessarily forestalled the progress of the case by twenty-nine months, the amount of prejudgment interest awarded should be accordingly reduced. Following a hearing on May 6, 2010, the trial justice denied that motion to amend, stating that he believed the prejudgment interest calculation was "fair and reasonable." Thereafter, Friedrich amended his appeal to this Court to include an appeal from the trial justice's denial of his Rule 59(e) motion.

## II

### Issues on Appeal

On appeal, Friedrich contends that the trial justice committed reversible error in finding that he tortiously interfered with the Greensleeves-Smiley contract. In his brief to this Court, he assails the trial justice's decision in that regard, asserting that he "relied on matters not in evidence, misconceived the evidence that was in the record, was clearly wrong in his view of

---

[9] Those two appeals were denied and dismissed by this Court. The first was an appeal from a Superior Court order denying Greensleeves's motion for attorneys' fees. We held that "[w]ithout a transcript * * * it [was] impossible to determine the basis for the trial justice's decision." Greensleeves, Inc. v. Smiley, 754 A.2d 102, 102-03 (R.I. 2000) (mem.). We dismissed the second appeal in an unpublished order. See note 4, supra.

some of the evidence, made findings of fact that [were] not supported by any evidence whatsoever, and made speculative findings far beyond the legitimate scope of the evidence." He therefore asks this Court to reverse the trial justice's decision or, in the alternative, to remand the case for a new trial. Additionally, he maintains that the trial justice erred in denying his motion to amend the judgment under Rule 59(e) to reduce the prejudgment interest.

## III

### Standard of Review

We have consistently held that "[t]his Court's review of the factual findings of a trial justice sitting without a jury is deferential." Pelletier v. Laureanno, 46 A.3d 28, 35 (R.I. 2012). As such, "we 'will not disturb the findings of a trial justice sitting without a jury unless such findings are clearly erroneous or unless the trial justice misconceived or overlooked material evidence or unless the decision fails to do substantial justice between the parties.'" Grady v. Narragansett Electric Co., 962 A.2d 34, 41 (R.I. 2009) (quoting Macera v. Cerra, 789 A.2d 890, 892-93 (R.I. 2002)). "If our review of the record before us 'indicates that competent evidence supports the [trial] justice's findings, we shall not substitute our view of the evidence for his [or hers] even though a contrary conclusion could have been reached.'" Thibaudeau v. Thibaudeau, 947 A.2d 243, 246 (R.I. 2008) (quoting Imperial Casualty and Indemnity Co. v. Bellini, 888 A.2d 957, 961 (R.I. 2005)). However, we review de novo the trial justice's conclusions of law. Gianquitti, 22 A.3d at 1165 (citing Waterman v. Caprio, 983 A.2d 841, 844 (R.I. 2009)).

Additionally, a trial justice's ruling on a Rule 59(e) motion following a bench trial will be overturned only if he or she committed a "manifest error of law in the judgment"—meaning an error that is "apparent, blatant, conspicuous, clearly evident, and easily discernible from a

- 11 -

reading of the judgment document itself." American Federation of Teachers Local 2012 v. Rhode Island Board of Regents for Education, 477 A.2d 104, 105, 106 (R.I. 1984).

**IV**

**Discussion**

**A**

**Did the Trial Justice Commit Reversible Error in Finding that Friedrich Tortiously Interfered with the Greensleeves-Smiley Contract?**

As appropriately stated by the trial justice in his bench decision, to establish a prima facie case of tortious interference of contract, Meyer must prove "(1) the existence of a contract; (2) [Friedrich's] knowledge of the contract; (3) his * * * intentional interference; and (4) damages resulting therefrom."[10] Belliveau Building Corp., 763 A.2d at 627 (quoting Smith Development Corp., 112 R.I. at 211, 308 A.2d at 482). The element of intentional interference requires a showing of legal malice—meaning "an intent to do harm without justification"—or that he acted "for an 'improper' purpose." Id. at 627, 628 (quoting Jolicoeur Furniture Co. v. Baldelli, 653 A.2d 740, 753 (R.I. 1995) and citing W. Page Keeton et al, Prosser and Keeton on the Law of Torts ch. 24, §129 at 978-79 (5th ed. 1984)). In deciding whether the interference was improper, this Court has articulated a list of non-exclusive factors for the trial justice to consider. The trial justice correctly recited those factors, which were summarized in Part I, supra.

Friedrich argues that the trial justice committed reversible error by considering matters outside of the record in finding him liable for tortious interference of contract. Specifically, he avers that the trial justice considered portions of deposition testimony provided by three witnesses—Smiley, Friedrich, and the attorney that had represented Meyer concerning the sale of

---

[10] Here, there is no dispute that there was a valid and enforceable contract between Greensleeves and Smiley. See Greensleeves, Inc. v. Smiley, 694 A.2d 714, 716 (R.I. 1997) (Greensleeves I).

the dock slips—that had not been admitted as full exhibits.  Parts of those depositions came in (1) as substantive evidence under Rule 801(d)(1)(A) of the Rhode Island Rules of Evidence; and (2) for impeachment purposes under Rule 613 of the Rhode Island Rules of Evidence.  Additionally, portions of those depositions were used to refresh the recollection of the witnesses under Rule 612 of the Rhode Island Rules of Evidence.  Friedrich contends that the trial justice reviewed and relied on portions of these depositions that had not been admitted into evidence.  After conducting our own independent review of the record, we agree with Friedrich that the trial justice's decision was clouded by references to matters outside of the record.

"It is well settled that error inheres in the action of a trial justice who * * * relies either in whole or in part on matters not in evidence."  Marcotte v. Marcotte, 102 R.I. 312, 315, 230 A.2d 429, 430 (1967) (quoting Sargent v. Sargent, 93 R.I. 359, 363, 175 A.2d 551, 553 (1961)).  However, such error is harmless and therefore not reversible if the trial justice relied on "ample evidence independent of the references [to matters outside the record] to support [his] ultimate decision * * *."  Thibaudeau, 947 A.2d at 247 (quoting Guertin v. Guertin, 870 A.2d 1011, 1018 (R.I. 2005)).  Therefore, we must determine whether the "sum of the other evidence supporting the [trial] justice's decision indicates to us that his consideration of the [matters outside the record] was not an inextricable component of his analysis of the case."  Id. at 246; see also State v. Ferreira, 21 A.3d 355, 369 (R.I. 2011) ("[W]hen a trial justice has considered matters not in the record * * * any error committed by the trial justice is harmless" if "such evidence is cumulative, and if [liability] is established by other competent evidence.").  Although we believe it was imprudent for the trial justice to have committed the above-cited errors, we conclude that such errors were harmless.  See Thibaudeau, 947 A.2d at 246, 247.  In discussing each of the

- 13 -

complained-of errors, we explain why they are harmless with respect to the trial justice's ultimate conclusion that Friedrich tortiously interfered with the Greensleeves-Smiley contract.

Friedrich ascribes error to the trial justice's conclusion that he had knowledge of the Greensleeves-Smiley contract—a linchpin of a tortious interference of contract claim. In support of this contention, Friedrich asserts that the trial justice erroneously attributed the following statement to Bullard in determining that Friedrich had such knowledge: "Friedrich [ran] back to his car * * * in a hurried fashion, saying words to the effect of over his dead body" after Bullard informed Friedrich that Smiley was selling the dock slips to Meyer. The trial justice then incorrectly stated that Meyer later corroborated Bullard's testimony in this regard. Our review of the record indicates that Meyer—not Bullard—testified to the above-referenced statement as worded.[11] Bullard's testimony was slightly different. A close look at Bullard's testimony indicates, though, that he did in fact tell Friedrich that Smiley was selling the dock slips to Meyer. Bullard stated that, when he told Friedrich that Smiley had sold his dock slips to Meyer, Friedrich was "astonished. He turned around and went back to his car and took off."

Moreover, Friedrich testified that, after he learned that Smiley was selling the dock slips, he immediately called Smiley and "chewed him out." Thereafter, Friedrich and Smiley signed a purchase and sale agreement, in which Friedrich agreed to pay Smiley $175,000 for the dock slips, which included a $20,000 cash payment. Although Friedrich testified at trial that he had never been informed that Smiley was selling the dock slips to Meyer, his prior deposition testimony told a different story. In his deposition, he acknowledged that he knew Smiley was dealing with Meyer regarding the sale of the dock slips. He stated that Smiley had so informed

---

[11] Although Friedrich's counsel objected to Meyer's testimony at trial, Friedrich does not challenge the admission of this testimony on appeal.

him "[a]t some point * * * between the time that [he and Smiley] were drafting the purchase and sale agreement and [the time] [Smiley] came for the $20,000 deposit."

Additionally, apart from the abundance of prior inconsistent statements that came to light at trial,[12] showing that Friedrich did indeed have knowledge of the Greensleeves-Smiley contract before he contracted with Smiley, the trial justice also took notice of Friedrich's demeanor on the stand. He noted that, "[w]hile testifying [at trial], [Friedrich's] demeanor when speaking about [Meyer] * * * evidenced more than just mere annoyance. * * * [H]is [temperament] and demeanor in [his] statements evidence[d] a [longstanding] personal dislike for her." Further, the trial justice determined that Friedrich's testimony on the stand was self-serving. Specifically, he observed that Friedrich sometimes had a "lapse of memory" at trial "when it was convenient for him."

As we have consistently stated, "[t]he task of determining the credibility of witnesses is peculiarly the function of the trial justice when sitting without a jury." Bogosian v. Bederman, 823 A.2d 1117, 1120 (R.I. 2003) (quoting State v. Sparks, 667 A.2d 1250, 1251 (R.I. 1995)). "[T]his Court affords a great deal of respect to the * * * credibility assessments made by the [trial justice] who has actually observed the human drama that is part and parcel of every trial and who has had an opportunity to appraise witness demeanor and to take into account other realities that cannot be grasped from a reading of a cold record." State v. Paola, 59 A.3d 99, 106 (R.I. 2013) (quoting State v. DiCarlo, 987 A.2d 867, 872 (R.I. 2010)). "Therefore, looking at [the trial justice's] credibility determinations through a prism of deference, as we must," we cannot say that he erred in finding that Friedrich's self-serving testimony at trial—testimony that

---

[12] "[P]rior inconsistent statements [are admitted] as substantive evidence as long as the declarant testifies at trial and is available for cross-examination." State v. Pusyka, 592 A.2d 850, 853 (R.I. 1991) (citing Rule 801(d)(1)(A) of the Rhode Island Rules of Evidence).

directly contradicted his prior deposition testimony—was not credible. See id. (quoting Ferreira, 21 A.3d at 367).

Furthermore, Friedrich asserts that the trial justice drew improper inferences from extra-record testimony in finding that he had knowledge of the Greensleeves-Smiley contract. In support of this contention, Friedrich states that the trial justice went outside the record in finding that Smiley was the "proverbial snake in the grass" because Smiley was "in debt to DEPCO."[13] It is clear that references regarding Smiley's financial situation with DEPCO appear only in deposition testimony outside the record. Moreover, at trial, Meyer's attorney, who had represented her in connection with the sale of the dock slips, testified that Smiley had asked him to prepare two separate purchase and sale agreements (one agreement for five of the dock slips, and another for the last dock slip). From this testimony, the trial justice then "infer[red]" that Smiley "wanted to essentially hide * * * the sale of * * * five [of the] [dock slips]" to defraud DEPCO out of the "lion's share" of the sale proceeds. In so inferring, he stated that, because Friedrich gave Smiley a $20,000 cash deposit for the sale of the dock slips, Smiley was "in cahoots" with Friedrich to "hide * * * or keep that out of the purchase and sale agreement or recorded documents."

Thus, Friedrich ascribes error to the trial justice's rejection of Smiley's testimony at trial, in which he stated that he did not inform Friedrich that he was dealing with Meyer regarding the sale of the dock slips. However, we conclude that, although the trial justice made extra-record references in finding that Smiley was "not worthy of belief," that error was harmless. There was

---

[13] The Rhode Island Depositors Economic Protection Corp. (DEPCO) was created by the General Assembly "[i]n the wake of * * * Rhode Island's banking and credit union crisis in the early 1990s * * * for the purpose of 'providing stability for financial institutions, promoting the welfare of the people of the state, and improving the economic welfare of the people of the state.'" Rhode Island Depositors Economic Protection Corp. v. Mapleroot Development Corp., 710 A.2d 167, 169 (R.I. 1998) (quoting G.L. 1956 § 42-116-2(d)).

ample evidence in the record upon which the trial justice found that Smiley was not a credible witness when he testified that he had not told Friedrich about his agreement with Greensleeves. We need look no further than Smiley's prior inconsistent statements. He testified at his deposition that, on the day he and Friedrich executed their agreement for the sale of the dock slips, Friedrich "knew" that Meyer "was the person [Smiley] had been dealing with regarding the sale of [those] slips." Additionally, in a pleading filed with the Superior Court, Smiley, asserting a cross-claim, had alleged that Friedrich was "aware of Smiley's negotiations with Greensleeves" and had "interfered with the relationship between Smiley and Greensleeves without legal justification to do so."

Friedrich next asserts that the trial justice erred in determining that he had a motive to interfere with the Greensleeves-Smiley contract. In evaluating Friedrich's credibility with respect to his testimony that he had never harbored any ill will toward Meyer, the trial justice considered a portion of Friedrich's deposition not admitted into evidence. Finding that Friedrich's testimony at trial "[did not] have the ring of truth," the trial justice stated that "there were other versions of events that [Friedrich] gave in his deposition testimony." In that deposition, he "apparently * * * let out his real feelings which were * * * that * * * Meyer was a constant problem, [and] that she was a constant threat to his * * * control of the association * * *." Additionally, in evaluating Friedrich's motive to interfere with the Greensleeves-Smiley contract, the trial justice relied on another fact not adduced in the record—specifically, how voting rights at the marina were apportioned and delegated—in making an inference that Meyer's acquisition of the dock slips would "[a]ffect the makeup of the board, including Friedrich's position as chairman of the board."

In <u>Avilla v. Newport Grand Jai Alai LLC</u>, 935 A.2d 91 (R.I. 2007), we cited a decision of the Alabama Supreme Court, stating that "motive is in most instances [not] enough to send these cases to the jury. There must still * * * be something 'illegal' about the means employed." <u>Id.</u> at 99 (quoting <u>Tom's Foods v. Carn</u>, 896 So.2d 443, 458 (Ala. 2004)). We take this opportunity to clarify that "illegal * * * means" is not an element of tortious interference of contract. Instead, as is abundantly apparent from our holding in <u>Avilla</u>, the means employed in so interfering must have been "improper." <u>Id.</u> at 97, 98. Although motive in and of itself is insufficient to demonstrate an improper interference, motivation to interfere cannot be ignored.

Here, we believe that the record adequately demonstrates that Friedrich not only had a motive to interfere, but also that this motive was the driving factor of his interference. Knowing that Meyer had already contracted with Smiley, he offered Smiley $10,000 more than what Meyer had agreed to pay; additionally, Friedrich agreed to pay $20,000 of the purchase price in cash. There was sufficient evidence in the record for the trial justice to have found that, "[g]iven Friedrich's personal animus toward Meyer," Friedrich was motivated to interfere with the contract in order to prevent her from acquiring the dock slips. Friedrich stated at trial that "[t]here was always friction between * * * Meyer and the board" and that he and the board harbored a belief that Meyer had been trying to "indirectly control the board." This testimony demonstrates that Friedrich considered Meyer a threat to his position at the marina. Additionally, given that Friedrich's own deposition testimony, which was admitted into evidence at trial, revealed that he knew that Smiley and Meyer were engaged in a deal for the sale of the dock slips, we cannot say that the trial justice committed reversible error in citing to the above-referenced extra-record evidence. There was clearly cumulative record evidence to support the

trial justice's determination that Friedrich intentionally and improperly interfered with the Greensleeves-Smiley contract.

Lastly, we address Friedrich's contention that any evidence regarding Meyer's above-referenced testimony pertaining to lawsuits regarding parking rights and payment of rental fees cannot be used to demonstrate any intentional interference with the Greensleeves-Smiley contract. He argues that such conduct is protected under this Court's adoption of the Noerr-Pennington doctrine in the context of common-law tort claims.[14] See Hometown Properties, Inc. v. Fleming, 680 A.2d 56, 60 (R.I. 1996) (quoting Pound Hill Corp. v. Perl, 668 A.2d 1260, 1263 (R.I. 1996) ("Although the [Noerr-Pennington] doctrine arose in a context of application of the antitrust statutes, it is based upon the First Amendment right to petition the government for redress of grievances.")). Although Friedrich presents this Court with an interesting question— to wit, whether any conditional immunity attached to his conduct in his representational capacity at Lee's Wharf, and if so, whether he may invoke that conditional immunity in this proceeding— we need not reach its merits because it is clear from the record that Friedrich has waived this argument. Although Friedrich objected to Meyer's testimony in this regard on grounds of relevance, he failed to raise any objection to her testimony based on his purported conditional immunity.[15] It is well settled "that when, at trial, the introduction of evidence is objected to for a

---

[14] "The United States Supreme Court developed the Noerr-Pennington doctrine in the context of antitrust litigation in order to protect the legitimate exercise of the constitutional right to petition the government after retributive civil claims were brought by parties harmed by petitioning activity." Hometown Properties, Inc. v. Fleming, 680 A.2d 56, 60 (R.I. 1996) (citing Professional Real Estate Investors, Inc. v. Columbia Pictures Industries, Inc., 508 U.S. 49, 56 (1993)).

[15] It appears from the record that counsel opted to provide the trial justice with posttrial memoranda in lieu of oral closing arguments. Friedrich first raised the issue of the purported conditional immunity in his posttrial memorandum, positing that "all of the 'conduct' cited by Meyer as evidence of [his] 'motive' is 'protected' activity, not improper or unlawful in any way." However, as stated above, he made no such objection to that testimony at trial.

specific reason, other grounds for objection are waived and may not be raised for the first time on appeal." State v. Hallenbeck, 878 A.2d 992, 1017-18 (R.I. 2005) (quoting State v. Bettencourt, 723 A.2d 1101, 1107 (R.I. 1999)). Moreover, "[a]ccording to our well-settled 'raise or waive' rule, issues that were not preserved by a specific objection at trial, sufficiently focused so as to call the trial justice's attention to the basis for said objection, may not be considered on appeal * * * despite their articulation at the appellate level." Id. at 1018 (quoting Bettencourt, 723 A.2d at 1107-08).

**B**

**Did the Trial Justice Err in Denying Friedrich's Motion to Reduce the Award of Prejudgment Interest?**

Friedrich asserts that, because this case was delayed by a period of twenty-nine months, during which Greensleeves pursued two unsuccessful appeals to this Court,[16] Greensleeves should not be entitled to an award of prejudgment interest for that period. General Laws 1956 § 9-21-10(a) provides in pertinent part that:

> "any civil action in which a verdict is rendered or a decision made for pecuniary damages, there shall be added by the clerk of the court to the amount of damages interest at the rate of twelve percent (12%) per annum thereon from the date the cause of action accrued, which shall be included in the judgment entered therein."

We have long held that "[t]he dual purpose of prejudgment interest is to encourage early settlement of claims and to compensate an injured plaintiff for delay in receiving compensation to which he or she may be entitled." Oden v. Schwartz, No. 2011-167-A., slip op. at 29 (R.I., filed May 16, 2013) (quoting Metropolitan Property & Casualty Insurance Co. v. Barry, 892 A.2d 915, 919 (R.I. 2006)).

---

[16] These two appeals are referenced in note 9, supra.

This Court declines Friedrich's invitation to adopt a fault-based analysis with respect to awards of prejudgment interest. We agree with New York's highest court that:

> "[prejudgment] interest is not a penalty. Rather, it is simply the cost of having the use of another person's money for a specified period * * *. [Prejudgment interest] is intended to indemnify successful plaintiffs 'for the nonpayment of what is due to them' * * *, and is not meant to punish defendants for delaying the final resolution of the litigation. It accordingly follows that <u>responsibility for the delay should not be the controlling factor</u> in deciding whether [prejudgment] interest is to be computed * * *." <u>Love v. State</u>, 583 N.E.2d 1296, 1298 (N.Y. 1991) (emphasis added).

Mindful of our limited standard of review, we cannot say that the trial justice committed a manifest error of law in his denial of Friedrich's Rule 59(e) motion to amend the judgment to reduce the award of prejudgment interest. <u>See</u> <u>American Federation of Teachers Local 2012</u>, 477 A.2d at 105-06.

## IV

## Conclusion

For the reasons stated in this opinion, we affirm the judgment of the Superior Court, to which we remand the record in this case.



**RHODE ISLAND SUPREME COURT CLERK'S OFFICE**

*Clerk's Office Order/Opinion Cover Sheet*

**TITLE OF CASE:**       Greensleeves, Inc. v. Philip B. Smiley, Sr. et al.

**CASE NO:**       No. 2010-230-Appeal.
(NC 95-262)

**COURT:**       Supreme Court

**DATE OPINION FILED:**   June 18, 2013

**JUSTICES:**       Suttell, C.J., Goldberg, Flaherty, Robinson, and Indeglia, JJ.

**WRITTEN BY:**       Associate Justice Gilbert V. Indeglia

**SOURCE OF APPEAL:**    Newport County Superior Court

**JUDGE FROM LOWER COURT**:

Associate Justice Stephen P. Nugent

**ATTORNEYS ON APPEAL:**

For Plaintiff:  Joseph R. Palumbo, Jr., Esq.

For Defendant:  Lauren E. Jones, Esq.