# United States Court of Appeals
## For the First Circuit

No. 14-1178

IRA GREEN, INC.,

Plaintiff, Appellant,

v.

MILITARY SALES & SERVICE CO.,

Defendant, Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF RHODE ISLAND

[Hon. John J. McConnell, Jr., U.S. District Judge]

Before

Howard, Selya and Stahl,[*]
Circuit Judges.

Christine K. Bush, with whom Craig M. Scott, Anastasia A. Dubrovsky, and Scott & Bush Ltd. were on brief, for appellant.
Brian C. Newberry, with whom Peter C. Lenart and Donovan Hatem LLP were on brief, for appellee.

December 19, 2014

---

[*]Judge Stahl heard oral argument in this matter, but thereafter recused himself and did not participate in either the panel's decisionmaking or the issuance of its opinion. The remaining two panelists have issued the opinion pursuant to 28 U.S.C. § 46(d).

**SELYA, <u>Circuit Judge</u>.** This is a bruising commercial dispute between business rivals. When the eponymous plaintiff, Ira Green, Inc. (Green), repaired to the federal district court, it charged the defendant, Military Sales & Service Co. (MilSal), with tortious interference and defamation. After prodigious discovery and an acrimonious trial, the jury returned a take-nothing verdict. The district court denied Green's post-trial motions and, adding insult to injury, corrected a portion of the judgment favorable to Green and awarded costs to MilSal. Green appeals, presenting a florid palette of claimed errors.

These claims of error include an issue of first impression in this circuit. In 2009, the Civil Rules were amended to enshrine a party's right to demand a jury poll. <u>See</u> Fed. R. Civ. P. 48(c). Here, Green requested such a poll, but did not receive one. Still, a party who requests a jury poll must act reasonably to preserve its rights and, in the circumstances of this case, Green did not do so. Consequently, its claim of error is unavailing.

The remainder of Green's asseverational array is more prosaic. Upon careful perscrutation, we discern no reversible error and affirm the judgment below. The tale follows.

### It's Not Easy Being Green

Green is a Rhode Island corporation engaged in the marketing and distribution of military insignia and tactical

products (such as headlamps, carabiners, and weather-resistant paper). Its primary customer is the Army and Air Force Exchange Service (AAFES), which operates retail shops (known as post exchanges) at military bases. MilSal, a Texas corporation, plies the same trade from a different angle. Acting as a manufacturer's representative, it brokers direct sales to divers customers including AAFES.

In 2010, Green acquired the assets of Brigade Quartermasters, Ltd. (Brigade), which had been AAFES's largest supplier of tactical gear. As part of the transaction, AAFES agreed to assign to Green the shelf space previously reserved for Brigade's products at its exchanges and Green, in return, ensured a continuous flow of the tactical products theretofore sold by Brigade. AAFES began issuing replenishment orders to Green, which obtained the requisitioned products from its suppliers (formerly Brigade suppliers) and filled AAFES's purchase orders.

Around the time that this arrangement started, MilSal hired Cliff Vaughn (an erstwhile Brigade employee). Vaughn gave MilSal confidential information about Brigade's costs and pricing arrangements. Armed with this data, MilSal began courting certain of Brigade's suppliers, touting the benefits of a direct-sales model.

In short order, MilSal wooed away several suppliers and persuaded them to stop filling Green's orders. AAFES began

ordering directly from the suppliers, including J.L. Darling Co. (Darling), a manufacturer of weather-resistant paper called Rite in the Rain. Green fought back. It started marketing STORM SĀF (a less-expensive alternative to Rite in the Rain) to AAFES.

The encroachment of STORM SĀF on sales of Rite in the Rain ruffled MilSal's feathers. In May of 2011, a MilSal executive, Scott Hance, sent an e-mail to Paul Atherton, an AAFES hierarch. Hance's e-mail claimed (falsely, in Green's view) that STORM SĀF "completely dissipates in water within a matter of seconds" and could compromise warzone missions. Even though AAFES's own tests found the two brands of paper to be of "equivalent" quality, orders of STORM SĀF dwindled.

Nonplussed by MilSal's tactics, Green shifted the battlefield from the marketplace to the courtroom. Invoking diversity jurisdiction, see 28 U.S.C. § 1332(a), Green sued MilSal in the United States District Court for the District of Rhode Island. Its complaint alleged defamation and tortious interference with both contractual and business expectancies. Based on information acquired during protracted discovery, MilSal counterclaimed. These counterclaims came to naught: one was dismissed at the pleading stage, and the rest were jettisoned on summary judgment.

After eight days of trial, the jury rejected Green's claims for tortious interference. On the defamation claim, the

jury sent a mixed message: it determined that MilSal "ma[d]e false and defamatory statements concerning Ira Green and/or its STORM SĀF products," but then determined that no damages flowed from this disparagement.

The clerk of court entered judgment for MilSal on the tortious interference counts and for Green on the defamation count. MilSal moved to amend the judgment because, absent damages, a required element of the defamation claim had not been proven. Agreeing with MilSal's reasoning, the district court entered an amended final judgment for MilSal on all the tried counts and for Green on the counterclaims.

Green moved for a new trial, and MilSal moved for an award of costs. As part of its motion, MilSal revealed for the first time that it had paid over $10,000 in counsel fees to enable it to secure the testimony of a witness. Green effectively amended its new trial motion to include a claim based on this revelation.

The district court denied Green's new trial motion and taxed costs in favor of MilSal. This timely appeal followed.

### *The Gold Standard*

In appellate litigation, the standard of review is tantamount to the gold standard. Thus, we pause at the outset to limn the standards of review that are implicated by Green's challenge to the district court's denial of its motion for a new trial.

Green brought its new trial motion under Federal Rule of Civil Procedure 59(a). Under this rule, "[a] district court may set aside the jury's verdict and order a new trial only if the verdict is against the law, against the weight of the credible evidence, or tantamount to a miscarriage of justice." Casillas-Díaz v. Palau, 463 F.3d 77, 81 (1st Cir. 2006). We review the district court's disposition of a new trial motion for abuse of discretion. See Crowe v. Marchand, 506 F.3d 13, 19 (1st Cir. 2007). An abuse of discretion will be found whenever a reviewed ruling is based on an error of law. See United States v. Connolly, 504 F.3d 206, 211-12 (1st Cir. 2007).

Green's motion posited that a new trial is obligatory because of a series of embedded legal errors. We analyze separately each of these cascading claims of error.

Some of Green's claims of error relate to the admission of evidence. Where, as here, objections have been preserved, a district court's evidentiary rulings are evaluated for abuse of discretion. See United States v. Zaccaria, 240 F.3d 75, 78 (1st Cir. 2001). Even if an abuse of discretion occurs, a new trial is not required unless the error in admitting evidence "had a substantial and injurious effect or influence upon the jury's verdict." Gomez v. Rivera Rodríguez, 344 F.3d 103, 118 (1st Cir. 2003); see Fed. R. Civ. P. 61.

Green's new trial motion also relies on assignments of instructional error. When examining preserved claims of instructional error, we afford de novo review to "questions as to whether jury instructions capture the essence of the applicable law, while reviewing for abuse of discretion . . . the court's choice of phraseology." DeCaro v. Hasbro, Inc., 580 F.3d 55, 61 (1st Cir. 2009). The district court must give a jury instruction on a material issue if the evidence presented at trial could plausibly support a finding for either side. See Wilson v. Mar. Overseas Corp., 150 F.3d 1, 10 (1st Cir. 1998); see also Faigin v. Kelly, 184 F.3d 67, 87 (1st Cir. 1999) (explaining when a refusal to give a requested instruction is reversible error).

In part, our decision on the jury-poll issue raised in the new trial motion implicates the plain-error doctrine. See United States v. Olano, 507 U.S. 725, 732 (1993). To prevail on plain-error review, an appellant must show "(1) that an error occurred (2) which was clear or obvious and which not only (3) affected the [appellant's] substantial rights, but also (4) seriously impaired the fairness, integrity, or public reputation of judicial proceedings." United States v. Duarte, 246 F.3d 56, 60 (1st Cir. 2001). The appellant must carry the devoir of persuasion as to each of these four elements. See United States v. Vega Molina, 407 F.3d 511, 521 (1st Cir. 2005).

-7-

***Singing the Blues***

Green asserts that the court below was too free in admitting evidence.  It composes a siren's song challenging several of the court's rulings.  But Green's arguments are off-key, and Green winds up singing the blues.

For the most part, Green's vision of improperly admitted evidence involves the prohibition against the introduction of hearsay testimony.  By definition, hearsay is an out-of-court statement "offer[ed] in evidence to prove the truth of the matter asserted."  Fed. R. Evid. 801(c)(2).  "It follows from this definition that a witness's first-hand account of an out-of-court statement, not offered to prove the truth of that statement, is not inadmissible hearsay."  United States v. Walker, 665 F.3d 212, 230 (1st Cir. 2011).  Put another way, an out-of-court statement is not hearsay if it is relevant regardless of its truth (say, to show state of mind).  See 2 McCormick on Evidence § 246 n.6 (Kenneth S. Broun ed., 7th ed. 2013).  As we explain below, the bulk of Green's hearsay objections fail because the challenged statements were offered and admitted for a non-hearsay purpose.

Green's first plaint targets the admission of the testimony of a MilSal senior manager, Robert Gregg Koefer, relating that AAFES's buyer (Atherton) had "conveyed to [MilSal] an interest in . . . set[ting] up [certain] vendors on a direct basis" and that the transition would take less than two weeks.  The record makes

manifest that these statements were admitted not for the truth of their contents — that AAFES was interested in converting to a direct-sales model and could do so within two weeks — but to show that Koefer had a non-culpable state of mind when soliciting vendors. See Greensleeves, Inc. v. Smiley, 68 A.3d 425, 434 (R.I. 2013). Indeed, the district court gave a limiting instruction directing the jury to consider Koefer's statements solely for this non-hearsay purpose.

Green next challenges the admission of certain testimony by a former MilSal marketing executive (Rick Fox) about Fox's conversation with Vaughn concerning Brigade's financial information. Pertinently, Fox testified that Vaughn implored him to "keep [the information] confidential" because "the tactical industry is extremely small" and Vaughn did not want to "tarnish" his relationships within the industry. Viewed in context, it is readily apparent that this testimony was admitted for a non-hearsay purpose: to show Fox's state of mind; that is, that he believed that MilSal was entitled to see and use, but not disclose, the information furnished by Vaughn. The truth of Vaughn's statements — that the industry is small and that releasing the information to others might tarnish his reputation — was not the issue; the statements were admitted only to illuminate Fox's state of mind and, thus, to rebut the theory that MilSal knowingly used filched information to solicit Green's suppliers.

-9-

We likewise reject Green's complaint about the admission of testimony from one of Darling's principals (Todd Silver).  This witness testified that a Brigade competitor seeking Darling's business had expressed its "understand[ing]" that Brigade was experiencing "problems" such as "not-in-stock" situations.

Rumors may be admitted, without regard to their accuracy, to show their motivating effect on the listener.  See, e.g., Smith v. Wilson, 705 F.3d 674, 679 (7th Cir. 2013); United States v. Worman, 622 F.3d 969, 974-75 (8th Cir. 2010).  MilSal argues persuasively that it offered this testimony for a non-hearsay purpose: to show that Darling was considering offers by Brigade's competitors and to explain Darling's reasons for defecting.  This interpretation is plausible.  Regardless of whether Brigade was actually experiencing problems, Darling might well have been influenced by the rumors to that effect.[1]  Given this plausible non-hearsay purpose, we are satisfied that the district court did not abuse its wide discretion in admitting the challenged testimony.  See United States v. Anello, 765 F.2d 253, 261 (1st Cir. 1985).

Green's final hearsay objection is more nuanced.  Exhibit L-3 (which the district court admitted over objection as a full exhibit) is a chain of e-mail messages between AAFES (in the person

---

[1] While a limiting instruction would have been helpful in highlighting this distinction, such an instruction was neither requested nor required.

of Dennis Walker) and Green (in the person of David Lumbley).  This collection of communiques conveyed to Green the results of AAFES's 2011 comparative evaluation of Rite in the Rain and STORM SĀF. Within this batch, a message from Walker dated March 30, 2012, stated that an evaluation of STORM SĀF had been conducted and that the "results were considered acceptable for this product and its intended use."  Another Walker message, dated April 4, 2012, stated, "The Storm Saf [sic] notebooks did not perform as well as the Right [sic] in the Rain.  We were able to use the pad, but the pads absorbed and retained more moisture, thus giving a fragile, frayed appearance."

MilSal says that the sole purpose of admitting this evidence was "to confirm that the testing was done" — but that is a proscribed use under the hearsay rule.  The exhibit was offered solely for the truth of Walker's statement that the product had been evaluated in 2011, and that fact goes directly to the causation element of Green's defamation claim.

The district court's rationale for admitting the evidence is no more convincing.  The court admitted Exhibit L-3 under the business records exception to the hearsay rule.  See Fed. R. Evid. 803(6).[2]  To invoke this exception at the time of trial, a party

_____

[2] Several amendments to Federal Rule of Evidence 803(6) took effect on December 1, 2014 (well after the trial had concluded). These changes are primarily stylistic and, in any event, do not apply to this case.

had to demonstrate that the proffered record was (1) "made at or near the time" of the act or event recorded, (2) "by — or from information transmitted by — someone with knowledge," (3) "kept in the course of a regularly conducted activity of a business," and (4) made as part of the "regular practice of that activity." Id. Here, the 2012 e-mails described what supposedly occurred in 2011. This lack of contemporaneity puts the exhibit outside the compass of the business records exception. See United States v. Goodchild, 25 F.3d 55, 62 (1st Cir. 1994). And the proffer was doubly flawed: the record contains no evidence that Walker (the author of the e-mail) had the requisite personal knowledge of either the evaluation or its results. See id.

Although we conclude that the challenged portion of Exhibit L-3 should have been excluded,[3] our inquiry does not end there. An error in the admission of evidence is harmless as long as the reviewing court can say with fair assurance that the jury would in all likelihood have reached an identical verdict had the contested evidence been excluded. See Gomez, 344 F.3d at 120. Because the statements in the exhibit were essentially cumulative

---

[3] In rejecting Green's motion for a new trial, the district court suggested that the e-mails were not hearsay because they were "not admitted for the truth, but to refresh [a witness's] recollection." That dog will not hunt: in the absence of special circumstances (not present here), a writing used to refresh recollection and not otherwise independently admissible may not be introduced into evidence by the questioner. See United States v. Socony-Vacuum Oil Co., 310 U.S. 150, 234 (1940); 1 McCormick on Evidence, supra, § 9 n.7.

-12-

of other untainted evidence,[4] their admission does not demand reversal.  See Harrington v. California, 395 U.S. 250, 254 (1969); Texaco P.R., Inc. v. Dep't of Consumer Affairs, 60 F.3d 867, 886 (1st Cir. 1995).

Green hawks one last claim of evidentiary error — a claim that does not implicate the prohibition against hearsay.  It argues that the district court erroneously allowed Atherton to testify without a sufficient foundation about what "AAFES believe[d]" and to interpret certain policies "from AAFES's perspective."

The premise on which this argument rests cannot be faulted.  Personal knowledge is a prerequisite for lay testimony.  See Fed. R. Evid. 602.  But the conclusion that Green draws is unwarranted.  The record makes manifest that the admission of Atherton's testimony did not breach this rampart.

Atherton was AAFES's primary buyer of tactical gear.  During the course of the trial, his personal knowledge of the requirements and policies governing his job was never contested.  The questions that he answered fell well within the scope of his

---

[4] Atherton's testimony confirmed that AAFES had, in the months following Hance's e-mail, conducted an independent evaluation of STORM SĀF and Rite in the Rain.  The record also contains evidence that Darling sent a video to AAFES describing comparative tests that it had performed.  With respect to Walker's statements that STORM SĀF pads "absorbed and retained more moisture, thus giving a fragile, frayed appearance," the jury had an opportunity to examine numerous (properly admitted) photographs comparing the products after exposure to various test conditions.  Some of these photographs indicated quite plainly that STORM SĀF was less resilient than Rite in the Rain.

employment (and, by fair inference, within the encincture of his personal knowledge).  No more was exigible.

## *Through Rose-Colored Glasses*

Green advances two preserved assignments of instructional error.  It views these assignments of error through rose-colored glasses, and we reject them.

Green's first claim is as queer as a clockwork orange.[5] It asserts — in what amounts to little more than an ipse dixit — that the district court's charge on the justification defense to tortious interference was "confusing."  Our review of this purported shortcoming in the charge is for abuse of discretion. See DeCaro, 580 F.3d at 61.

Claims of tortious interference with contractual or business relations require proof, among other things, of the defendant's intentional and improper interference with the contractual or business relationship.  See Greensleeves, 68 A.3d at 434; Mesolella v. City of Prov., 508 A.2d 661, 669-70 (R.I. 1986). Interference is improper if it is without justification; that is, if it is "for an improper purpose." Greensleeves, 68 A.3d at 434 (internal quotation marks omitted).  Once the plaintiff makes out

---

[5] The phrase "clockwork orange" came into popular usage in 1962, when Anthony Burgess's novel of that name was published.  In a later article, Burgess explained that the title had its genesis in an old cockney phrase "as queer as a clockwork orange."  Burgess defines the phrase as implying something bizarre — "a queerness . . . so extreme as to subvert nature."  Anthony Burgess, The Clockwork Condition, The New Yorker, June 4, 2012, at 69, 69.

a prima facie case of tortious interference, the defendant may counter that prima facie case by showing that the interference was justified. See Belliveau Bldg. Corp. v. O'Coin, 763 A.2d 622, 627 (R.I. 2000). The burden of proving justification rests with the defendant. See id.

In charging the jury on the tortious interference counts, the district court first explained the elements of Green's prima facie case and the various factors shedding light on improper purpose. It then described the justification defense to the jury:

> A defendant is not liable simply for committing an intentional act that interferes with a plaintiff's contracts or business relationships. The interference also must be impermissible or unjustified. In other words, a defendant would not be liable for legitimately competing with a plaintiff for business.
> If you find that Ira Green has proven that [MilSal] acted intentionally and for an improper purpose, the burden shifts to [MilSal] to prove that its interference was justified. . . .
> If you find that [MilSal] was justified in interfering with Ira Green's contracts and/or business relationships, you should find that [MilSal] is not liable for tortious interference with contracts and/or business relationships.

Green suggests that this instruction, which came after the court had allocated the burden of proving the tort to Green, implied that Green was required to prove twice that MilSal's interference was improper.

This argument is vecordious. The instruction correctly informed the jury about the shifting burdens of proof and neither stated nor implied that Green was obliged to rebut any evidence of justification adduced by MilSal. To the contrary, the court made it clear that the jury should exonerate MilSal only "[i]f . . . [MilSal] was justified in interfering with Ira Green's contracts and/or business relationships." This portion of the instructions, read seamlessly, was neither misleading nor confusing.

Green resists this conclusion. It argues that the location of a particular sentence ("In other words, a defendant would not be liable for legitimately competing with a plaintiff for business") insinuated that MilSal's interference was presumed justified and, thus, misled the jury.

Green is seeing ghosts under the bed. Legitimate competition between business rivals constitutes a justification for interference. See Ocean State Physicians Health Plan, Inc. v. Blue Cross & Blue Shield of R.I., 883 F.2d 1101, 1113 (1st Cir. 1989) (citing Restatement (Second) of Torts § 768 (1979)). Reading the challenged sentence in the context of the instructions as a whole, there is no conceivable risk that a reasonable juror would understand it as setting up a presumption that MilSal's efforts at competition were legitimate.

-16-

Green's second claim of instructional error also fails. It calumnizes the district court for refusing to instruct on defamation per se.

Rhode Island law supplies the substantive rules of decision in this diversity case. See Hanna v. Plumer, 380 U.S. 460, 465 (1965); Correia v. Fitzgerald, 354 F.3d 47, 53 (1st Cir. 2003). The Rhode Island Supreme Court has explained that "a statement is defamatory per se if it charges improper conduct, lack of skill, or integrity in one's profession or business, and is of such a nature that it is calculated to cause injury to one in his profession or business." Marcil v. Kells, 936 A.2d 208, 213 (R.I. 2007). Rhode Island's highest court has not yet decided a case mapping the intersection of defamation per se and product disparagement. We think it reasonable to predict that the court, when faced with the question, will adopt the prevailing rule as set forth in the Restatement (Second) of Torts. Cf. id. (following Restatement in defamation action). Under the Restatement, a false statement concerning the quality of goods is actionable as disparagement but is not actionable as defamation per se unless "made under circumstances and in a manner that implies that the manufacturer or vendor is dishonest, fraudulent or incompetent." Restatement (Second) of Torts § 573 cmt. g (1977); see Nat'l Ref. Co. v. Benzo Gas Motor Fuel Co., 20 F.2d 763, 771 (8th Cir. 1927) (a false statement directed at goods is not "libelous per se as to

-17-

the corporation, unless by fair construction and without the aid of extrinsic evidence it imputes to the corporation, fraud, deceit, dishonesty, or reprehensible conduct in its business").

Green insists that a reasonable jury could conclude that statements disparaging the quality of STORM SĀF, which neither mentioned Green by name nor suggested that Green knew about the purported flaws, imputed to Green dishonesty, fraud, or incompetence. We do not agree: the evidence in the record simply will not support a plausible finding that MilSal's product disparagement of Green's wares amounted to defamation per se.

The statements in question — to the effect that STORM SĀF dissipates quickly in water and, therefore, will compromise the warzone mission — are no more than "a caution against the goods, suggesting that the articles . . . do not answer their purpose." Evans v. Harlow, (1844) 114 Eng. Rep. 1384, 1388; 5 Q.B. 624, 633. Such statements are surely actionable as product disparagement. See, e.g., Vascular Solutions, Inc. v. Marine Polymer Techs., Inc., 590 F.3d 56, 59 (1st Cir. 2009) (per curiam). But competition is the lifeblood of a free-market economy, and business rivals frequently knock one another's wares. In the marketplace, then, garden-variety criticism of the quality of goods, without more, is insufficient to ground a claim of defamation per se against either the manufacturer or the vendor. See Nat'l Ref., 20 F.2d at 767-70 (collecting cases). Although any statement denigrating the

-18-

efficacy of a product will likely have some impact on the reputation of its manufacturer or its vendor, more is needed to sink to the level of defamation per se. There is no "more" here. It follows that the district court did not err in refusing to instruct the jury on defamation per se.

### *Not Quite a White Knight*

Green soldiers on. It argues that MilSal's failure to disclose that it had paid counsel fees in order to secure the testimony of Todd Silver (a principal of Darling) was a discovery violation. Had it known, Green says, it would have made devastating use of the information on cross-examination to undercut MilSal's suggestion that Silver was a white knight who had "fl[own] 3,000 miles across the country voluntarily . . . to come and testify."

Green raised this argument for the first time in what amounted to an amendment to its motion for a new trial. This was <u>before</u> the time for filing a motion for a new trial had elapsed. <u>See</u> Fed. R. Civ. P. 59(b). Hence, the argument is cognizable as a ground for a new trial.[6] Our review is for abuse of discretion. <u>See</u> <u>Crowe</u>, 506 F.3d at 19.

We need not tarry. Even assuming that a discovery violation occurred — and that is far from clear — the district

---

[6] In mounting this challenge, Green also invokes Federal Rule of Civil Procedure 60(b)(3). Because that reference does nothing to enhance Green's position, we leave it unremarked.

court supportably concluded that the fact of the payment had only meager evidentiary value. Silver was a volunteer who testified without a subpoena. There was a history of litigation between Green and Darling. Given that history, Darling's insistence on having an attorney present when Silver testified and its demand that MilSal defray its counsel fees reflect prudent business judgment. Nothing about that cautious arrangement contradicts the voluntary nature of Silver's court appearance.

We add, moreover, that neither Silver nor his company profited from the challenged payment; rather, it went directly into the coffers of a law firm. As such, any inference of bias arising out of the payment would have been strained and, therefore, easily dispelled. Seen in this light, the district court's conclusion that the undisclosed payment did not impede Green's ability to litigate the case was supportable. And the court's bottom-line determination that this circumstance did not justify a new trial was not an abuse of discretion. See Casillas-Díaz, 463 F.3d at 81.

### A Gray Area

We come now to the thorniest of the arguments made in support of Green's new trial motion. Addressing this argument takes us into a gray area surrounding the forgone jury poll. We start by sketching the relevant events.

The court submitted the case to the jurors with instructions that they complete a six-question verdict form (a

reconstruction of which is annexed hereto as Appendix A). When the jury returned its verdict, the court asked the foreperson to report on the jury's answers to the questions posed in the verdict form. Following the court's lead, the foreperson read into the record the answers to Questions 1, 3, and 5. He was not asked to report on the other three questions.

That was when things began to unravel. The answers to Questions 1 and 3 mooted Questions 2 and 4, so those questions were appropriately ignored. Question 6 was not moot, yet the court did not pursue that question with the jury foreperson.

The court next inquired whether any party wished to poll the jurors individually. One of Green's lawyers responded affirmatively. At the same time, he reminded the court that the answer to Question 6 had not been reported.

The court turned immediately to the oversight: it read Question 6 aloud and asked the foreperson to announce the jury's answer. Once the announcement had been made, the court thanked the jurors for their service and discharged them. None of Green's three attorneys reminded the judge of the earlier request for a jury poll.

On Green's motion for a new trial, the district court concluded that its failure to poll the jury was harmless. Green asseverates that the failure to poll constituted per se reversible error. MilSal counters that Green waived its right to a jury poll

by failing to speak up when it became clear that the district court, distracted by the need to complete the reporting of the verdict, had forgotten about the earlier jury-poll request.

For over two centuries, there was an open question in the federal courts about "'whether a party may demand a poll of the jury in a civil action as a matter of right or whether that decision is commended to the discretion of the district court upon motion by counsel.'" Audette v. Isaksen Fishing Corp., 789 F.2d 956, 959 (1st Cir. 1986) (quoting Kazan v. Wolinski, 721 F.2d 911, 916 n.5 (3d Cir. 1983)). This uncertainty was resolved in 2009 when Federal Rule of Civil Procedure 48 was amended by adding subsection (c) to make a jury poll mandatory upon timeous request. See Fed. R. Civ. P. 48(c) ("After a verdict is returned but before the jury is discharged, the court must on a party's request, or may on its own, poll the jurors individually."). The new provision was "drawn from Criminal Rule 31(d) with minor revisions to reflect Civil Rules Style and the parties' opportunity to stipulate to a nonunanimous verdict." Fed. R. Civ. P. 48(c) advisory committee note to 2009 amend.

A party's right to poll the jury is "of basic importance." Audette, 789 F.2d at 959 (quoting Miranda v. United States, 255 F.2d 9, 17 (1st Cir. 1958)). Individual polling helps to ensure unanimity by unmasking coercion and exploring the possibility that a juror may change her mind about a verdict after

-22-

leaving the jury room.  See id. at 958-59.  But the right to individual polling is not of constitutional dimension, and it can be waived if not invoked in a timely manner.  See Humphries v. District of Columbia, 174 U.S. 190, 194 (1899); Jaca Hernandez v. Delgado, 375 F.2d 584, 585-86 (1st Cir. 1967).

In the criminal context, the prevailing rule is that a failure to poll the jury after a timely request constitutes per se reversible error.  See, e.g., United States v. F.J. Vollmer & Co., 1 F.3d 1511, 1522 (7th Cir. 1993); Virgin Islands v. Hercules, 875 F.2d 414, 419 (3d Cir. 1989); Miranda, 255 F.2d at 18.  The law is much less clear in the civil context.  In one of the very few cases applying Rule 48(c), a panel of the Seventh Circuit noted its belief that the presumption of prejudice attaching to violations of Criminal Rule 31(d) was "fully applicable to its civil analogue." Verser v. Barfield, 741 F.3d 734, 738 (7th Cir. 2013). Extrapolating from this premise, the court postulated, in dictum, that "a district court's refusal, or even neglect, to conduct a jury poll upon a timely request is ground for a new trial."  Id.

The Seventh Circuit's position has much to commend it. The criminal and civil rules on jury polling are now virtually identical.  Compare Fed. R. Crim. P. 31(d), with Fed. R. Civ. P. 48(c).  Common sense suggests that these rules should be interpreted in pari passu.

Such a suggestion, though, is open to legitimate question. More than one state court, interpreting similar parallel mandatory jury-polling rules, has concluded that a violation of the right to a jury poll engenders automatic reversal in criminal cases but not in civil cases. See, e.g., Wiseman v. Armstrong, 989 A.2d 1027, 1040-41 (Conn. 2010) (distinguishing State v. Pare, 755 A.2d 180, 182 (Conn. 2000)); see also id. at 1038 & n.18 (collecting cases from other jurisdictions). Those courts review a trial court's failure to conduct a requested jury poll in a civil case for harmless error. See, e.g., id.

Here, however, this gray area can be left unexplored. Green's failure to renew its jury poll request after the district court completed the announcement of the verdict takes this case outside the mainstream. We explain briefly.

Green initially sought two things: polling the jury and completing the reporting of the verdict. The district court — sensibly, in our view — attended first to completing the verdict report. After that was accomplished, Green failed to renew its jury-poll request.

We have noted in other contexts that a district court's inadvertent failure to make a ruling is not equivalent to a denial. Rather, "a party who seeks a ruling must persist in his quest to some reasonable extent." DesRosiers v. Moran, 949 F.2d 15, 23 (1st Cir. 1991); see United States v. Ortiz, 966 F.2d 707, 715 (1st Cir.

-24-

1992).  After all, the law ministers to the vigilant, not to those who sleep upon their rights.  See, e.g., Dow v. United Bhd. of Carpenters & Joiners, 1 F.3d 56, 61 (1st Cir. 1993).  Other courts have indicated that this principle is applicable in the jury-poll context where, say, counsel could reasonably have objected while the jury was filing out of the courtroom.  See, e.g., United States v. Marinari, 32 F.3d 1209, 1215 (7th Cir. 1994).  So, too, where a party could have requested that the jury be recalled for polling after dismissal but before the jury had dispersed.  See, e.g., United States v. Beldin, 737 F.2d 450, 455 (5th Cir. 1984); Baker v. Sherwood Constr. Co., 409 F.2d 194, 195 (10th Cir. 1969) (per curiam).

In this case, Green's legal team had ample opportunity to act once it became apparent that the district court had forgotten Green's earlier jury-poll request.[7]  They could have done so immediately after the foreperson completed the reading of the verdict form.  Similarly, they could have done so either when the court purposed to discharge the jury or when the jury was filing out of the courtroom.  See Marinari, 32 F.3d at 1215 ("Counsel risks waiver of [the party's] right to a poll by merely waiting and

---

[7] We assume (but do not decide) that the original jury-poll request was effective even though it was proffered before the verdict had been completely reported.  Cf. Miranda, 255 F.2d at 18 (remarking that a jury-poll request made before the verdict is announced would be premature).

watching as the jury disappears behind the closed door of the jury room.").

Here, moreover, Green's counsel had a final opportunity. The district court had suggested that the jurors wait in the jury room so that the court could thank them personally. Thus, when the court (before adjourning) asked counsel if there was "anything left to say," Green's lawyers could have taken up the jury-poll matter then and there. Given this collocation of circumstances, we conclude that Green's request for a jury poll was waived. Cf. Putnam Res. v. Pateman, 958 F.2d 448, 457 (1st Cir. 1992) (noting, in an analogous context, that failure to object at a point when the jury could still be reconvened may constitute a waiver).

A waived claim is generally not reviewable on appeal. See United States v. Rodríguez, 311 F.3d 435, 437 (1st Cir. 2002) (distinguishing between waived claims and forfeited claims with respect to appellate review). In an effort to skirt this barrier, Green maintains that the waiver doctrine requires a deliberate action, see id., and that there is no indication that its failure to renew its jury-poll request was deliberate. But claims of error can be deemed waived; and where, as here, a party in effect trades a long-shot chance (having the jury polled) for better odds (seeding the record with a promising issue for appeal), we think that deliberateness may be inferred. As we said in a different but analogous setting, "[t]o hold otherwise 'would place a premium on

-26-

agreeable acquiescence to perceivable error as a weapon of appellate advocacy.'" Reilly v. United States, 863 F.2d 149, 161 (1st Cir. 1988) (quoting Merchant v. Ruhle, 740 F.2d 86, 92 (1st Cir. 1984)).

To be sure, there may be an alternative explanation for what occurred: that Green's attorneys were asleep at the switch. But even assuming, favorably to Green, that the jury-poll claim was forfeited rather than waived, the verdict would nonetheless be unimpugnable. Appellate review of forfeited claims is for plain error, see Rodríguez, 311 F.3d at 437, and Green's claim stumbles at the third step of the plain-error framework.

The third step of plain-error review embodies a requirement that the asserted error be shown to have affected a party's substantial rights. See Duarte, 246 F.3d at 60. For an error to affect a party's substantial rights, it must be prejudicial. See id. at 61; see also Johnson v. United States, 520 U.S. 461, 466 (1997) (approving inquiry into harmlessness of error under plain-error review even in cases involving structural error). In the context of a failure to poll the jury, we think that carrying this burden requires, at the very least, some showing that the verdict was rendered under circumstances indicating a possible lack of unanimity or assent. See United States v. Lemmerer, 277 F.3d 579, 592 (1st Cir. 2002); cf. Verser, 741 F.3d at 742 (finding prejudice, in analogous circumstances, due in part to the "jury's

-27-

initial indication that it was deadlocked, [and] the speed with which it then returned a verdict"); United States v. Luciano, 734 F.2d 68, 70 (1st Cir. 1984) (indicating that prejudice would exist where judge raced to record verdict despite "jurors who expressed a lingering doubt").

In this case, there is nothing that might suggest to even the most wary observer that the jurors were not all of one mind. The court emphasized in its charge that the jurors' verdict must be unanimous and the record offers no reason for disregarding the time-honored presumption that jurors obey such instructions. See Lemmerer, 277 F.3d at 593-94. Just before the verdict was announced (albeit incompletely), the court inquired whether the jurors had reached a unanimous verdict. They collectively responded in the affirmative. After the verdict had been announced, the court asked, "is that the true and accurate verdict of each and every one of you?" All of the jurors answered "Yes." Last but not least, in denying relief the district court noted that there was "nothing in the jurors' demeanor or behavior to suggest that any one of them did not" agree with the verdict. Green has pointed to nothing that impugns this assessment.

That ends this aspect of the matter. Even if the jury-poll request was merely forfeited, the poll's omission cannot be said to have affected Green's substantial rights. There was no plain error.

### A Silver Bullet

We move now to the district court's amendment of the judgment — a ruling that Green challenged both at the time and in its subsequent new trial motion. We review this ruling, too, for abuse of discretion. See Companion Health Servs., Inc. v. Kurtz, 675 F.3d 75, 87 (1st Cir. 2012).

We set the stage. After the jury had been discharged, the clerk of court entered judgment for MilSal on the tortious interference claims and for Green on the defamation claim. MilSal promptly moved to amend the judgment to reflect that it, not Green, had prevailed on the defamation claim.

The district court granted the requested relief. Although MilSal's motion invoked Federal Rule of Civil Procedure 59(e), the court purposed to amend the judgment under Federal Rule of Civil Procedure 60(a), which allows the court to correct clerical errors.[8]

Though Green vociferously objects to the court's invocation of Rule 60(a), we need not inquire whether the clerk's action was susceptible to correction under that rule. We have the option of viewing the action through the lens of Rule 59(e). See

---

[8] In itself, a recharacterization of this kind is not problematic: a district court is not bound by the label that a party affixes to a motion but ordinarily may recharacterize the motion as invoking a more appropriate rule. See Gulf Coast Bank & Trust Co. v. Reder, 355 F.3d 35, 38-39 (1st Cir. 2004); United States v. Morillo, 8 F.3d 864, 867 (1st Cir. 1993).

<u>Companion Health</u>, 675 F.3d at 87. So viewed, the amendment to the judgment easily passes muster.

In terms, Rule 59(e) permits a motion to alter or amend the judgment to be brought within 28 days next following the entry of judgment. The rule admits of some play in the joints. It does not list specific grounds for affording relief but, rather, leaves the matter to the sound discretion of the district court. <u>See</u> <u>Venegas-Hernandez</u> v. <u>Sonolux Records</u>, 370 F.3d 183, 190 (1st Cir. 2004); <u>see</u> <u>also</u> <u>Palmer</u> v. <u>Champion Mortg.</u>, 465 F.3d 24, 30 (1st Cir. 2006). This discretion must be exercised with considerable circumspection: revising a final judgment is an extraordinary remedy and should be employed sparingly. <u>See</u> <u>Palmer</u>, 465 F.3d at 30. To secure relief under Rule 59(e), a party normally must demonstrate either that new and important evidence, previously unavailable, has surfaced or that the original judgment was premised on a manifest error of law or fact. <u>See</u> <u>id.</u>; <u>FDIC</u> v. <u>World Univ. Inc.</u>, 978 F.2d 10, 16 (1st Cir. 1992).

The district court's action satisfied this standard. To begin, the motion was filed well within the temporal window framed by Rule 59(e) and was therefore timely.

Moreover, the judgment was plainly wrong.[9] Green's claim for defamation per se had fallen by the wayside, <u>see</u> <u>supra</u>, and

---

[9] We add that the judgment entered by the clerk was also incomplete; it did not address the counterclaims at all.

damages were an essential element of the defamation claim submitted to the jury. See Nassa v. Hook-SupeRx, Inc., 790 A.2d 368, 373 n.10 (R.I. 2002). The jury explicitly found that Green had proven no damages. This finding was a silver bullet that killed the claim and required the entry of judgment for MilSal on that claim. The district court therefore acted comfortably within the realm of its discretion in amending the judgment.

### *Tie a Yellow Ribbon . . .*

Before we wrap up this case and tie a yellow ribbon around it, we must examine the district court's award of costs. See Fed. R. Civ. P. 54(d)(1). Boasting about its successful defense of the counterclaims, Green submits that each side prevailed in part and, therefore, the district court should not have awarded costs to MilSal as the prevailing party.

Rule 54(d)(1) creates a presumption favoring recovery of costs by prevailing parties. See Estate of Hevia v. Portrio Corp., 602 F.3d 34, 46 (1st Cir. 2010). When no party clearly prevails, the common practice is to order the litigants to bear their own costs. See id. (citing representative cases). But this practice is not carved in granite: among other exceptions, the district court retains discretion to award costs to a party who, though losing on some claims, substantially prevails in the case as a whole. See Hillside Enters. v. Carlisle Corp., 69 F.3d 1410, 1416 (8th Cir. 1995); Scientific Holding Co. v. Plessey Inc., 510 F.2d

-31-

15, 28 (2d Cir. 1974). A classic example of a case in which this discretion may appropriately be exercised is one in which a defendant, though losing on a counterclaim, succeeds in warding off a predominant claim. See, e.g., Scientific Holding, 510 F.2d at 28; see also Hevia, 602 F.3d at 46 (stating, in dictum, that "the district court surely could have awarded costs to the defendants notwithstanding the dismissal of the counterclaims").

Determining who is the prevailing party for the purpose of taxing costs is not a purely arithmetic exercise. The court must do more than merely count and contrast the number of claims on which each side prevailed. Substance ought to triumph over form, and a mixed result does not preclude the trial court from awarding costs to the party whom it reasonably determines carried the day.

We review the district court's decision to award costs to MilSal for abuse of discretion. See In re Two Appeals Arising Out of San Juan Dupont Plaza Hotel Fire Litig., 994 F.2d 956, 963 (1st Cir. 1993). In this instance, we discern no hint of abuse. Green's complaint, culminating in an eight-day trial, was obviously the main event, and MilSal won an unqualified victory there. Compared to the amount of time, effort, and resources devoted to the claims that were tried, the counterclaims — disposed of pretrial — were a sideshow. Indeed, Green itself described those counterclaims as "weak."

-32-

Nor did the district court overlook Green's modest successes.  In its ruling on costs, the court expressly acknowledged that Green had prevailed on the counterclaims.  It noted that the counterclaims were filed nearly two years after the complaint and were resolved, with comparatively little fuss or furor, prior to trial.  Implicit in the court's ruling was the conclusion, well-supported by the record, that the claims that went to trial were predominant.

Considerable deference is due to a district court's decision to award or refrain from awarding costs in a case producing mixed results.  See Roberts v. Madigan, 921 F.2d 1047, 1058 (10th Cir. 1990).  Mindful of this precept, we reject Green's importuning that we vacate the award of costs.

### Red Sails in the Sunset

We need go no further.  For the reasons elucidated above, we hold that the district court did not err in denying Green's motion for a new trial, in amending the judgment, or in taxing costs in favor of MilSal.  Consequently, we give our stamp of approval to the amended judgment entered below.


**Affirmed**.

-33-

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

IRA GREEN, INC.,                    )
    Plaintiff,                      )
                              )
                               )
v.                                  )          C.A. No. 10-207-M
                               )
MILITARY SALES & SERVICE CO.,       )
    Defendant.                      )

**JURY VERDICT FORM**

1.  Did Defendant Military Sales & Service Co. ("MSS") tortiously interfere with one or more of Ira Green's contracts?

       Yes   _____

       No    ✓

    **If your answer is "Yes," please proceed to Question 2; if your answer is "No," please proceed to Question 3.**

2.  What damages, if any, do you award Ira Green for MSS's tortious interference with contract?

       $ _____

3.  Did MSS tortiously interfere with one or more of Ira Green's business relationships or expectancies?

       Yes   _____

       No    ✓

    **If your answer is "Yes," please proceed to Question 4; if your answer is "No," please proceed to Question 5.**

4. What damages, if any, do you award Ira Green for MSS's tortious interference with Ira Green's business relationships or expectancies?

$ _____

**Please proceed to Question 5.**

5. Did MSS make false and defamatory statements concerning Ira Green and/or its STORM SĀF products?

Yes _____✓_____

No _____

**If your answer is "Yes," proceed to Question 6; if your answer is "No," you are finished.**

6. What damages, if any, do you award Ira Green as a result of MSS's defamation?

$ *None*

The foreperson should sign and date below, and then tell the Court Security Officer know that you have reached a verdict. Thank you.

_____
Foreperson

____9/18/2013____
Date